**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

COREY LEACH, ANTHONY JACOB, PRIAMO
FERMIN, NEFTALI PELLOT, and GARY PHIFER,
individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

NBC UNIVERSAL MEDIA, LLC; SONY PICTURES
TELEVISION, INC.; WOODRIDGE PRODUCTIONS,
INC.; BONANZA PRODUCTIONS INC.; WARNER
BROS. TELEVISION, A DIVISION OF WB STUDIO
ENTERPRISES, INC.; MADWOMAN IN THE ATTIC,
INC.; TVM PRODUCTION, INC.; and PROSPECT
PARK NETWORKS, LLC,

Defendants.

Civil Action Nos: 1:15-CV-07208-AT;
1:16-CV-01411-RJS; 1:15-CV-07941-
AT; 1:15-CV-07206-LGS

COREY LEACH, ANTHONY JACOB, and ROBERT
TRACEY, individually and on behalf of all others
similarly situated,

Plaintiffs,

-against-

FOX ENTERTAINMENT GROUP, INC.; WARNER
BROS. ENTERTAINMENT INC.; BONANZA
PRODUCTIONS, INC.; OUTERBANKS
ENTERTAINMENT; PRIMROSE HILL
PRODUCTIONS; DC COMICS INC; and CAST &
CREW PAYROLL, LLC,

Defendants.

PRIAMO FERMIN and CHRISTIAN PELLOT,
individually and on behalf of all others similarly situated,

                              Plaintiffs,

                    -against -

BROKEN RECORDS, LLC; HALF A YOGURT, LLC;
and JOHN DOES 1-20,

                              Defendants.

GARNETT MORGAN, JONATHAN TUCKER, CAROL
FORREST, FERDIE HEADLAM, and ALI
MUHAMMED, individually and on behalf of all others
similarly situated,

                              Plaintiffs,

                    -against-

WARNER BROS. PICTURES, A DIVISION OF WB
STUDIO ENTERPRISES INC.; CHIME
PRODUCTIONS, LLC; NEW LINE PRODUCTIONS,
INC.; and JOHN DOES 1-20,

                              Defendants.

**DECLARATION OF SARA WYN KANE IN SUPPORT
OF PLAINTIFFS' UNOPPOSED MOTION FOR CERTIFICATION OF THE
SETTLEMENT CLASS, FINAL APPROVAL OF THE CLASS AND FLSA
COLLECTIVE ACTION SETTLEMENT, AND APPROVAL OF ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES AND SERVICE AWARDS**

I, SARA WYN KANE, do hereby declare and affirm as follows:

1.      I am an attorney at law, admitted to the bar of the State of New York and duly licensed to practice before the United States District Court for the Southern District of New York.

2.      I am a founding partner at my firm, Valli Kane & Vagnini LLP ("VKV"), and am counsel for the Plaintiffs in *Leach v. NBC 15-cv-07206, Leach v. Fox, 15-cv-07208, Fermin v. Broken Records 15-cv-07941 & Morgan v. Warner Bros.  16-cv-01411* (together, the "PPA Actions").

3.      I am fully familiar with the facts and circumstances set forth herein and I make this Declaration in support of Plaintiffs' Unopposed Motion for Certification of the Settlement Class, Final Approval of the Class and FLSA Collective Action Settlement, and Approval of Attorneys' Fees, Reimbursement of Expenses and Service Awards.

4.      This Settlement pertains to Bonanza Productions Inc., Warner Bros. Entertainment Inc., Warner Bros. Television, a Division of WB Studio Enterprises Inc., Warner Bros. Pictures, a Division of WB Studio Enterprises Inc., Chime Productions, LLC, New Line Productions, Inc., (the "Warner Bros. Defendants" as defined in the Settlement Agreement), and  Broken Records, LLC, and Half A Yogurt, LLC, (together with Home Box Office, Inc. the "HBO Defendants" as defined in the Settlement Agreement) (the Warner Bros. Defendants and HBO Defendants, together, "Defendants"). [1]  The Settlement provides a fair and reasonable resolution of the Litigation, and incorporates and recognizes the substantial risks the Parties faced or would face

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Settlement Agreement.

had the Litigation continued, whether at Class Certification, De-Certification, Trial or Appeal. In comparison to many FLSA settlements, we believe the overall recovery in this case that was made available, through this Settlement, to Members of the Class of no less than 100% of their overtime damages, no less than 45% of their liquidated damages and further recovery on their other claims is outstanding and one we as counsel resoundingly stand behind.

**OVERVIEW AND LITIGATION**

5.     These actions were brought by current and former Parking Production Assistants ("PPAs") who worked to secure sets, lots and streets on movie and television production sites throughout the New York City metropolitan area on productions allegedly produced by one or more of the Defendants.  The PPAs are non-exempt employees who allege that they were paid a shift rate of pay and that Defendants failed to properly compensate them for overtime hours worked.

6.     Plaintiffs Corey Leach, Neftali Pellot, Gary Phifer, Anthony Jacob, Robert Tracey, Priamo Fermin, Christian Pellot, Garnett Morgan, Jonathan Tucker, Carol Forrest, Ferdie Headlam, and Ali Muhammed, worked as PPAs and commenced the actions by filing Complaints in this Court on their own behalf and on behalf of those Plaintiffs' allege are similarly situated. Through the Complaints, Plaintiffs specifically alleged that Defendants' did not pay Plaintiffs and all other similarly situated individuals properly for all hours worked over forty (40) in a workweek, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq*. ("FLSA") and New York State Labor Law, § 190, *et. seq*. ("NYLL"), and the Wage Theft Prevention Act, NYLL § 195. Plaintiffs brought claims on behalf of themselves and a putative collective under the FLSA and also sought to bring claims on behalf of a putative opt-out class under Rule 23 of the Federal Rules

of Civil Procedure for all PPAs who worked in the New York City metropolitan area during the relevant time period.  Defendants vigorously deny Plaintiffs' allegations.

**INVESTIGATION AND SETTLEMENT**

7.      In the months after the Complaints were filed, the Parties explored settlement of the claims.  To facilitate these negotiations, the Parties exchanged detailed information and numerous documents, and conducted detailed legal and factual analyses of the Plaintiffs' claims and Defendants' defenses.  Both sides conducted their own analysis regarding the (1) potential liability if the claims were to proceed; (2) relative strengths and weaknesses of the legal merits of their respective positions; and (3) risks associated with each side's respective positions.

8.      In preparation for the mediation, and in the course of the litigation, Class Counsel conducted a significant factual investigation into the claims asserted.  The investigation included interviewing over one hundred potential opt-ins and/or Class Members and obtaining and reviewing thousands of pages of data pertaining to job duties, payment methodology, hours worked, schedules, time sheets, policy manuals, pay stubs and working conditions.  Class Counsel also investigated and analyzed the applicable state and federal law as applied to the facts discovered with regard to the claims asserted and the potential defenses thereto.

9.      The Parties' respective investigations also included the informal exchange of documents, including tens of thousands of entries of payroll data produced by Defendants. Extensive efforts were made by Class Counsel to identify the proper parties and to amend the Complaints accordingly. [2]

---

[2] Specifically, in *Leach v. NBC* the Third Amended Complaint was filed in February 2016 (Dkt. No. 148); in *Leach v. Fox*, the Second Amended Complaint was filed in November 2015 (Dkt. No. 76); in *Fermin v. Broken Records*, the First Amended Complaint was filed in February 2016 (Dkt. No. 79); and in *Morgan v. Warner Bros.*, the First Amended Complaint was filed in June 2016 (Dkt. No. 48).

10.     Based upon the extensive informal discovery process both parties had information about size of the potential settlement class, the scope of the Plaintiffs' employment and other information, including details regarding the "shooting"/production schedules, persons involved in scheduling Plaintiffs' hours, how communications with Plaintiffs were accomplished, and policies and practices regarding payroll which was processed by third party entities.  Plaintiffs' counsel undertook an extensive investigation and analysis of these records in order to determine Plaintiffs' potential damages, including back pay, liquidated damages, and Wage Theft Prevention Act damages.  During the investigation, and prior to any notice being issued, Class Counsel met with and interviewed hundreds of potential class members and filed hundreds of early opt-ins before the Court Ordered Notice was issued.[3]  Plaintiffs' counsel interviewed, either in person, telephonically or via electronic means, these additional opt-ins and obtained and reviewed relevant data including work histories, paystubs, schedules, timesheets, personal notes and work records from these individuals.

11.     On July 27, 2016, the Parties engaged in an all-day mediation session with Mark Rudy, an experienced class and collective action mediator.  The Parties ultimately agreed on the financial terms of a settlement.  Between August 2016 and January 2017 the Parties exchanged numerous drafts and engaged in significant and timely arm's-length negotiations to address the specific terms of the written settlement agreement.

12.     These negotiations resulted in an agreement to settle the Plaintiffs' claims against Defendants on the terms set forth in the Settlement Agreement submitted to the Court, which was executed in and around the end of December 2016 and beginning of January 2017. A true and

---

[3] Consents to Join were filed in the PPA Actions as follows:  *Leach v. NBC*, 15cv7206, (approximately 114 opt-ins prior to notice); *Leach v. Fox*, 15cv7208,(approximately 104 opt-ins prior to notice); *Fermin v. Broken Records*, 15cv7941, (approximately 105 opt-ins prior to notice); and *Morgan v. Warner Bros*, 16cv1411, (approximately 75 opt-ins prior to notice).

accurate copy of the Settlement Agreement is attached hereto as Exhibit 1. Thereafter on January 20, 2017, Plaintiffs' Unopposed Motion for Preliminary Approval was filed, and on February 16, 2017 Your Honor granted the Motion (Dkt. No. 302 in 15-cv-07206; Dkt. No. 179 in 15-cv-07208, Dkt. No. 168 in 15-cv-07941 & Dkt. No. 111 in 16-cv-01411).

**CLAIMS ADMINISTRATION**

13.     Pursuant to the Court's Preliminary Approval Order, the Claims Administrator, KCC, issued the Notice Packet (including the Notice and Claim Form), created the website for Class Members to Access, created a 1-800 number for Class Member questions and issued a Reminder Postcard to those who had not yet returned their Claim Form, reissued Notice to those individuals for whom KCC had updated addresses, and fully complied with the requirements as set forth in the Settlement Agreement and the Court's Order. The Notice set forth the material settlement terms, instructing Class Members on how to participate, how to exclude themselves, how to object and when the Final Approval Hearing was scheduled, as well as the average estimated settlement amount should all requested fees and the settlement be approved by the Court. *See* Declaration of Derek Smith Claims Administrator ("KCC Decl.") annexed hereto as Exhibit 2 ¶¶ 4-9.

14.     No Class Member excluded themselves from or objected to the Settlement. *Id.* at 15. On the other hand, the Claim Form response rate was substantial. The median participation rate for settlements of this nature is typically 15%.[4] Here 46.18%[5] of the Class Members have submitted Claim Forms. This is a substantial result.

---

[4] See Memorandum of Law at 31, citing *Would an Opt In Requirement Fix the Class Action Settlement? Evidence from the Fair Labor Standards Act* 80:2 MISS.L.J. 443, at 489-91 (Winter 2010).
[5] Based on the additional Notices that went out, this participation percentage may increase.

15.     Defendants' counsel have represented to Class Counsel that notice of the Settlement was provided in accordance with the Class Action Fairness Act of 2005 ("CAFA), 28 U.S.C. § 1715, and that no objections were received in response to such notice.

**RISKS OF LITIGATION**

16.     The Parties and their counsel recognize that, in the absence of an approved settlement, they likely would face a long and uncertain litigation course, including motions to dismiss, motions to sever, motions related to conditional and class certification (including de-certification), formal discovery, motions for summary judgment, trial and potential appellate proceedings.  The litigation would consume significant amounts of time and resources, and present the Parties with ongoing litigation risks and uncertainties.  The Parties desire to avoid these risks and uncertainties, and filed for conditional certification of the Settlement.  Based upon our experience, Class Counsel acknowledge that a fair and reasonable settlement achieved earlier, rather than later, will aid the named Plaintiffs (as well as the Class Members) by obtaining payment much sooner than what otherwise could be the case.  Class Counsel are particularly cognizant of this based on our role as class counsel in other FLSA and Rule 23 actions. One example is *Indergit v. Rite Aid,* 1:08-cv-09361 (JPO)(HBP), where we represent a nationwide collective and New York class of store managers in claims that have been pending in the Southern District of New York since 2008.  In the time since the *Indergit* matter was filed, we have opposed a motion to dismiss/summary judgment, made a motion for conditional certification which was opposed and ultimately granted, defended over 50 depositions, took upwards of two dozen depositions, made a motion for class certification which was granted, and opposed defendant's motion to decertify the class, etc. After nine (9) years of litigation, last week the court in *Indergit* granted plaintiffs'

unopposed motion for preliminary approval of the parties' settlement.  *See Indergit v. Rite Aid,* Dkt. No. 329.

17.     Similarly, in or around December 2013, we filed *Roberts v. TJX, 1:13-cv-13142 (Mass.)*, a collective and class action which ultimately involved seven law firms representing Assistant Store Managers alleging the defendants misclassified the plaintiffs as exempt, thereby improperly depriving them of overtime pay.  The parties there have engaged in pre-conditional certification discovery and plaintiffs moved for conditional certification in or around September 2015.  In March, the Court in *Roberts v. TJX* issued a decision granting conditional certification. Yet, due to the adversarial nature of the proceedings in that action (i.e., no settlement has been reached) notice has yet to go out to the class.  Thus, as we know from these and numerous other experiences, not only can the issues in a collective action be novel and unique, and the law unsettled, but the time and costs of such a case can be considerable.

18.     Here, the claims had all the hallmarks of complex and extended FLSA and state law litigation. The risks of proceeding with this case have been set out above, but for emphasis included the Plaintiffs having to establish that: one or more of the Defendants jointly or otherwise employed PPAs within the meaning of the FLSA and NYLL; Plaintiffs were not properly compensated for all hours worked; Plaintiffs did not receive compliant wage notice and wage statements under the NYLL; and that class and collective action treatment of Plaintiffs' claims is appropriate, particularly given that payroll practices and personnel differed from production to production.

**QUALIFIED SETTLEMENT FUND AND PROGRAMMATIC RELIEF**

19.     The Settlement Agreement sets forth the specific financial details of the Settlement, including the Qualified Settlement Fund ("QSF"), as well as the efforts toward programmatic relief

made by one or more Defendants in response to Plaintiffs' allegations. The QSF covers all Participating Claimants Final Settlement Payments, Service Payments, Class Counsel's Fees, Costs and Expenses, and a $25,000 Reserve Fund.  In addition to the QSF, Defendants are responsible for the Claims Administration fees and costs and the Employer's Share of Employer Payroll Taxes. When compared to other wage and hour settlements the Gross and Net Settlement Amounts here are more than adequate and provide an outstanding result.

20.     The allocation of monetary awards to Participating Claimants from the QSFs is based on a points system.  For purposes of determining the allocation of funds to Class Members, points were assigned to each Class Member[6]  by applying an allocation formula to payroll records provided by Defendants (the "Assigned Points").[7] *See* KCC Decl. ¶ 3 attached hereto referencing Formula attached as Exhibit "A" to KCC Decl.).  Each Participating Claimant will receive a portion of the funds available based upon the points assigned by the Claims Administrator, in accordance with the formula, but in no event will any share be less than the Alternative Minimum Settlement Payment of fifty dollars ($50.00).  See KCC Decl. ¶ 18 attached hereto as Exhibit 2.

21.     Should the Court award attorneys' fees commensurate with Class Counsel's request of one third (1/3) of the Gross Settlement Amount, and had every Class Member availed themselves of the recovery obtained on behalf of the Class, each person with overtime claims would have received the equivalent of 100% of their alleged unpaid wages and approximately 45%

---

[6] Defendants provided weekly payroll records which identified the number of weeks worked per PPA and the gross pay per work week.  Defendants and/or Plaintiffs and opt-in Plaintiffs also provided records or information regarding the shift/daily rates of pay per production. From this data, Class Counsel was able to determine the allegedly lawful hourly rates of pay and the total number hours of worked for each Class Member on any particular production.  In turn, counsel was able to calculate an overtime rate as applied to the number of overtime hours worked per Class Member.  Notably, daily/shift rates varied between productions and seasons of the same production.

[7] The Formula encompasses three main types of alleged damages: (A) overtime (back pay), (B) Wage Theft Prevention Act claims and (C) liquidated damages.  Points were allocated to each Class Member proportionally based on factors such as overtime hours and workweeks.

of their liquidated damages, as well as some percentage of damages for their other wage related claims. Even Participating Claimants with no overtime claims will receive a Settlement Payment related to their alleged Wage Theft Prevention Act claims.

**STRENGTH OF RESULT**

22.     Based on our experience in this field, this is an outstanding result.  It is entirely possible that, even if the Plaintiffs had litigated for years, a class had been certified, and the Plaintiffs had survived an almost inevitable appellate challenge to certification, prevailed at trial and won a likely appeal, the relief the Settlement Class may have achieved would be less than achieved in settlement.  Of course, there is also the genuine risk of achieving no relief at all.

23.     As Class Counsel, we are of the opinion that the proposed Settlement is fair, reasonable and adequate.  Further, we believe that the Settlement Agreement is in the best interest of the members of the Class in light of all known facts and circumstances, including the significant risks and delays of litigation that are presented by the defenses and potential pre-trial and appellate issues the Defendants may assert.  A resolution of the Plaintiffs' claims at this early stage – rather than following a year or likely more of discovery, conditional certification and Rule 23 certification motions and briefing, potential post certification further discovery, pretrial proceedings and potential trial, and the costs attendant upon and likely to be incurred through such activities – most certainly inures to the benefit of the Class.  In reaching our conclusion that the Settlement here is fair, reasonable and adequate, Plaintiffs' counsel can draw upon its experience in similar matters as set forth more fully below.

24.     Class Counsel negotiated an amount for attorney fees as an additional sum incorporated into the common fund only after obtaining significant recovery of each Class

Member's damages.  As a result, no Class Member has had his or her recovery reduced by any amount for attorney's fees or costs.

25.     Class Counsel believes that the fairness and reasonableness of the Settlement can best be understood by considering that, according to Plaintiffs' calculations, **after** deducting Attorney Fees & Costs of 1/3 of the Gross Settlement Amount, Service Awards and the Reserve Fund, and even without the additional funds that will be distributed from any Unclaimed Funds, the Gross Settlement Amount of $8,000,000 achieves payment to the Class Members of a pre-tax net amount that represents the equivalent of one hundred percent (100%) of their alleged lost back wages, approximately 45% of their alleged liquidated damages, plus damages for their other claims.  Finally, in addition to Defendants funding the Participating Claimants' Settlement Payments, the Reserve Fund and the approved attorneys' fees, from the $8,000,000 Gross Settlement Amount and QSF, Defendants will also pay the costs and fees of the Claims Administrator, and the Employer's Share of Payroll Taxes[8].  This is an outstanding result.  Thus I believe the terms of the Settlement Agreement are in the Settlement Class' best interest and are fair, reasonable, and adequate.  In addition, our firm has fully advised the Class Representatives of the Settlement Agreement, which they approved, and they approve of and consent to the Settlement.

**FIRM BACKGROUND**

26.     At Valli Kane & Vagnini LLP ("VKV"), I am primarily responsible for overseeing the firm's participation in wage and hour collective and class actions, False Claims Act cases, class and mass discrimination actions, and confidential alternative dispute resolutions of class/mass and

---

[8] In addition, the payments to the Named Plaintiffs in the amount of $2,500 each in exchange for their general release of claims come from the Unclaimed Funds and therefore do not diminish the recovery to the Participating Claimants. Had there not been any Unclaimed Funds, Defendants would have been responsible for these payments in addition to the QSF.

individual actions, as well as charges filed with the Equal Employment Opportunity Commission ("EEOC") and various equivalent state agencies.  I have been appointed lead or co-lead counsel and/or worked as counsel in the following cases[9]:

(a) *Brown et.al. v. Medicis* – 1:13-cv-01345 (D.O.C.) (Title VII gender discrimination case, Judge Richard J. Leon appointed Sara Wyn Kane as Lead Class Counsel along with Cyrus Mehri of Mehri & Skalet, PLLC and the two firms as Class Counsel; $7,150,000.00 settlement for a class of 225 women).  Judge Leon's order states that the class representatives have "hired counsel experienced in litigating employment discrimination class actions."  The Order approves an attorney fee award in the amount of 35%, plus reimbursement of all reasonable costs, plus expenses and a $150,000 payment for fees on the one year anniversary of the order for work associated with implementing the settlement agreement);

(b) *Kudo v. Panda Express* 7:09-cv-00712 (S.D.N.Y.) – (FLSA misclassification class of 155 opt-ins, settled for $2,975,000.  Judge Cathy Seibel in awarding 33 1/3% in fees to class counsel (VKV Co-lead Counsel), stated, "…Plaintiffs' counsel have experience in this type of case, and have succeeded in negotiating an award that has real value for the class members...." (Dkt No. 308 at 5-6) and "Class Counsel have extensive knowledge in litigating wage and hour collective and class actions such as this, are familiar with the complex factual and legal questions at issue in this Litigation, and have and will continue to adequately represent the Plaintiffs and members of the Settlement Class in a comprehensive and vigorous manner." (Dkt No. 309 at 3);

---

[9] For a more complete Firm resume, *See* Exhibit 4.

(c) *Indergit v. Rite Aid,* 1:08-cv-09361, Dkt. 239 at 40 (S.D.N.Y. Sept. 26, 2013) (FLSA and NYLL pending misclassification case with thousands of opt-ins and class members). Judge J. Paul Oetken in granting certification and denying decertification stated, "[i]t is clear that counsel is qualified and able to conduct the litigation." (Dkt No. 239 at 40).

(d) *Beaty et. al. v. Hillshire Brands et. al-* 2:14-cv-58 (E.D.T.X. – Marshall Division). This was a race discrimination action wherein Class Counsel represented many individuals against one defendant. The EEOC issued a finding of class-wide discrimination against Sara Lee and joined our previously filed lawsuit. The case was settled for $4 million.

(e) *United States of America, ex rel, Hinestroza et.al. v. Ralex Services, et al* 10-cv-0822 (E.D.N.Y.). This was a *Qui Tam* case wherein Class Counsel represented the Relator. The Government intervened in the action and we worked with the Government to settle the case for $2,200,000.00.

(f) *Roberts et. al. v. TJX – 1:13-cv-13142* (D.Mass) (Nationwide (ex. CA) FLSA misclassification case). Judge Burroughs approved $4,750,000 settlement for the Training Claim of 4,018 combined class members, which covered the limited time period when Assistant Store Managers were training for their positions. VKV along with co-counsel were appointed class counsel for the settlement classes and awarded thirty-three and one-third percent (33 1/3%) of the common fund in fees, costs and expenses. In the preliminary approval order the Judge stated that, "the Court is satisfied that the terms and conditions set forth in the Settlement Agreement are the result of good faith, arm's length settlement negotiations between competent and experienced counsel…" and in the final order that, "Plaintiffs have been represented by highly competent attorneys with substantial experience litigating wage and hour claims, and pursuing such claims in class and

collective actions." The Court granted conditional certification on the ASM misclassification claims for the time period after the training concluded and the notice will be issued to the class in the near future.

(g) *Taylor v. Turner Industries Group, LLC* - 2:11-CV-0057 (E.D.T.X. – Marshall) Along with co-counsel, Class Counsel obtained a jury verdict of over $4 million in a racial harassment and discrimination case; VKV and co-counsel received the Texas Lawyer publication's employment "Verdicts Hall of Fame" award for 2014.

27.  VKV has over 60 collective years of civil rights and wage and hour litigation experience amongst its partners. The firm's partners and associates have actively prosecuted well over one thousand individual actions and numerous mass, class and collective actions on behalf of employees subject to age, race and gender discrimination under Title VII and comparable state and federal laws, and wage and hour claims under the FLSA and comparable state laws. VKV has also filed numerous individual and class claims with the EEOC nationwide and has garnered significant individual and class-wide relief through the EEOC conciliation and litigation process. *See* Firm and Attorney Summary Ex. 4).

**REQUEST FOR ATTORNEY FEES AND COSTS**

28.  Class Counsel is petitioning for an award of $2,666,666 in fees, costs, and expenses, representing one-third (1/3) of the Gross Settlement Amount, an amount we believe to be fair and proper given that we undertook to prosecute this action without any assurance of payment, litigating this case on a wholly contingent basis in the face of tremendous risk, and given the results obtained, as set forth above and in Plaintiffs' Unopposed Motion for Final Approval. These cases are inherently complicated and time consuming. Any firm that undertakes the representation of hundreds of employees in these types of actions is undertaking a tremendous

investment of time, energy and resources.  Due to the contingency arrangement Class Counsel made this investment with the very real possibility of an ultimately unsuccessful outcome and no fee at the end of the process.  Additionally, requesting a percentage of the Settlement is consistent in aligning our interests with those of the Class in obtaining the maximum possible recovery.  *See* Memorandum of Law at 42.  The attorney's fee request for one-third (1/3) of the Gross Settlement Amount to cover all attorney's fees, costs, and expenses was set forth in the Notice to the Members of Class, which stated, under the section headed "Are attorney fees, costs, expenses and service payments being sought?," the following:

> Class Counsel has pursued the lawsuit on a contingent basis and has not received any payment of fees or any reimbursement of their out-of-pocket expenses related to the recovery on behalf of the Class. As part of the Settlement, Class Counsel will ask the Court to approve a payment to them of one-third of the Settlement fund for their attorneys' fees costs and expenses.  Class Counsel seeks these attorneys' fees to pay for investigating the facts of this case, litigating this case and negotiating the Settlement In addition the Named Plaintiffs will seek service payments of $2,500 each for their role in the case and two individuals who participated in settlement negotiations will seek service payments of $1,000 each for their assistance in the case. Attorney fees, costs, expenses and service payments will NOT be deducted from your personal allocated Settlement Payment set out herein.

See Exhibit B to the KCC Decl. annexed hereto as Exhibit 2.  Not a single objection was received to the requested fee award.

### TIME AND LABOR EXPENDED

29.     While the percentage method is primarily utilized by this Court in assessing fee requests, the following information is submitted in support of the lodestar cross-check.  The lodestar cross-check confirms that under the percentage method the attorney fee request is fair.  Moreover, Class Counsel is not seeking our reasonable and necessary litigation expenses in

addition to the fee request, as would have been done in a lodestar application.[10] Rather, those

expenses will be reimbursed from the attorney fee award itself.

30.     Over the past two years, Class Counsel have spent approximately 1,721.93 attorney,

paralegal and support staff hours investigating, litigating and settling the claims relating to the

Defendants.[11]  We intentionally staffed the PPA Actions in an effort to minimize duplication,

exercise billing judgment and to have work performed by the attorney, paralegal or support staff

with the lowest hourly rate who was able to effectively perform it.  Attached as Exhibit 3 are

summaries of time spent by each attorney, paralegal, and support staff members as of August 11,

2017, as well as their respective rates.  Attached as Exhibit 4 is our firm and individual attorney

resumes.

31.     The hours reported are reasonable for a case of this complexity and size and were

compiled from contemporaneous time records maintained by each attorney, paralegal and support

staff person participating in the case.

32.     Attached as Exhibit 5 are contemporaneous time records.

33.     As of August 11, 2017, Class Counsel's total lodestar on the case is approximately

$700,454.17.  Class Counsel's request for 1/3 of the fund, or $2,666,666 is approximately 3.8

times their lodestar.  The multiplier that Class Counsel seeks will diminish over time as additional

time is spent administering the Settlement and working on the case, including preparing for and

attending the final fairness hearing, continuing to answer class member questions, continuing to

answer questions from the claims administrator, and negotiating and working with Defendants'

---

[10] The expenses in this matter are approximately $7,700. These costs were incidental and necessary to the
prosecution of this lawsuit and include court and process server fees, postage and courier fees, transportation,
working meals, photocopies, electronic research and Plaintiffs' share of mediator's fees.

[11] This settlement pertains to one out of the four defendants in Leach v. NBC, and all Defendants in Leach v. Fox,
Fermin v. HBO and Morgan v. Warner Bros.  The time allocated to these Defendants is not included in the time
allocated to other defendants in these or other actions.

counsel on any issues that may arise in connection with administering the Settlement and distributing the Settlement funds.  Thus, the requested attorney's fees are not based solely on time and effort already expended, but also to compensate Class Counsel for time they will be required to spend administering the Settlement in the future.  In our experience, administering these types of class settlements requires an ongoing commitment.  Following Notice to the Class, Class Counsel responded to numerous inquiries from Class Members about the terms of the Settlement as well as the procedures to participate.  Given Class Counsel's ongoing communications with the early opt-ins we expect an unusually high amount of continued Class Member inquires through and beyond final approval as members of the Settlement Class report lost checks and request new ones, raise questions about tax consequences and generally call for advice. There will, in addition, also be time spent overseeing the finalization of the claims process through KCC.  It can fairly be estimated that this time will add significant hours of work for the lawyers and staff of our firm.

34.    Our firm regularly and ordinarily bills clients on an hourly fee basis based upon each attorney's standard hourly rates.  Currently, the rate ranges in our retainer agreements are from $500-600 per partner's hour, $300-500 per associates' hour, $150-250 per paralegal, interns or support staff hours.  The firm's clients regularly accept and pay these rates. The overwhelming amount of work spent on developing, investigating, litigating and settling the PPA cases meant the firm turned away hourly matters, including hourly litigation matters, in order to enable its attorneys and staff to work on the PPA cases on a contingency basis.  The hundreds of intakes our office conducted that ultimately led to the filing of over 100 opt-ins prior to the dissemination of Notice, as well as the amount of pre and post filing work necessary to determine the proper defendants, evidences the level of commitment our firm made to this and the other PPA cases.

35.     During the initial stages of Class Counsel's investigation into allegations of improper and unlawful pay practices we met with various PPAs that identified similar practices across productions upon which they provided services, and over an extended period of time.  Class Counsel gathered specific information pertaining to each production Class Members worked on by network (i.e. NBC, FOX, HBO) and/or film production company (i.e. Warner Bros., HBO). Given that any one PPA may have worked across multiple networks or film productions in a given year, Class Counsel opened a general billing entry to track their time for this investigation (including interviewing over 100 PPAs).

36.     As the investigation progressed and Class Counsel began to formulate the claims, we recognized the complexities of joining multiple defendants in one action, even though our investigations indicated that multiple entities were listed as producers on virtually all of the productions at issue.  Accordingly, a determination was made to file multiple actions against defendants by production and network rather than one mass action including all productions filmed over the prior six years.  Leading into the pleadings phase of our filings, Class Counsel opened individual, specific billing entries in our billing software, based on the actions filed.

37.     Once the *Leach v. NBC* 15cv7206 action was filed, certain defendants began to inform Class Counsel that some productions attributed to various defendants were in fact the responsibility of other production entities.  As a result, additional defendants appeared in that action, certain defendants were dismissed via Fed. R. Civ. R. 41, and other actions were ultimately filed to address different productions. Therefore, in the *Leach v. NBC* action there are four defendants – NBCUniversal, SONY, Warner Bros. and TVM, each with their own separate billing. Similarly, in *Leach v. Fox,* 15cv7208, there are now two defendants, Warner Bros. and Bonanza Productions; in *Fermin v. Broken Records*, 15cv7941, the two defendants are Broken Records and

Half a Yogurt; and in *Morgan v. Warner Bros*, 16cv1411, the remaining defendants are Warner Bros, New Line Productions and Chime Productions.  The Settlement at issue herein resolves the claims against the Defendants in these three actions in their entirety.

38.     For all Class Counsel's work relating to the defendants spanning this and other matters, we continued to utilize the general billing method.  Some examples of items that are in the general PPA billing include court appearances, communication with the Court, discussions with defense counsel pertaining to the litigation generally, negotiation and finalizing of the confidentiality agreements, etc. are all in the general PPA bill.

39.     However, all of Class Counsel's activities solely relating to specific defendants are recorded on the specific bill for each defendant.  These activities include specific discovery pertaining to each defendant such as payroll data checks, weekly reports, as well as the investigation into a particular defendant.  Damages calculations, settlement discussions, mediation and/or settlement conferences, etc. are billed only to that particular defendant. Additionally, while the drafting of PPA specific Preliminary Approval and Final Approval documents were billed to the general PPA bill, the defendant specific versions of the settlement documents (term sheets, settlement agreements, preliminary approval motion, proposed order, declaration and exhibits, as well as the final approval motion, proposed order, declaration and exhibits) were billed to each defendant.

40.     We began exercising billing judgment from the onset of the case.  For example, if Class Counsel attended a Court conference wherein four sets of defendants were present, we did not bill separately to every defendant, rather we billed once.  Thus, in finalizing Class Counsel's lodestar, Counsel reviewed the general PPA billing and divided up that bill among the following three groups of defendants, which have been named in actions filed by PPAs: NBCUniversal,

WBHBO, and SONY/FOX (TVM). Thus, the total lodestar Class Counsel is attributing to each set of the Defendants from the general bill is 1/3 of the general billing time. This is in addition to the specific Defendant billing file. Thus, throughout the litigation, no work that was performed solely for any other defendants in other settlements and/or actions was included in the work billed to the settlement of the Defendants here. This includes all of the time spent preparing for the mediation, attending the mediation, reviewing documents post-mediation, negotiating the terms of the settlement, drafting, editing and submitting the Preliminary Approval papers, working with defense counsel and the Claims Administrator to monitor the Notice process and ultimately to review and assess all of the data pertaining to the class and prepare, finalize and submit the Final Approval Papers.

41. Class Counsel took great care to efficiently litigate and settle the claims by consolidating actions and even settlements when defendants were amenable to doing so. Unfortunately, circumstances were such that many of the defendants believed it was best to have separate settlements and settlement negotiations. Thus, Class Counsel, while making every attempt to minimize duplication of efforts, was required to negotiate monetary and virtually all other terms ultimately set forth in the Settlement Agreements/Stipulations with defendants individually (other than the Defendants herein who were amenable to and did negotiate one agreement). This led to the extensive time spent on each settlement.

42. Class Counsel, in seeking a one-third fee (1/3) is asking the Court to recognize the strength of the recovery (the equivalent of 100% of Class Members' overtime damages, plus another 45% of their liquidated damages, plus other damages), including the programmatic relief reflected in the Settlement Agreement, as well as to acknowledge the risks Class Counsel undertook and the numerous public policy arguments (as set forth more fully in the Memorandum

of Law) favoring an award of one-third (1/3) of the fund.  Further, as set forth above, the firm is not seeking additional sums towards the costs and expenses the firm has incurred, which, while not substantial, do minimally reduce the requested one-third (1/3).

**SERVICE PAYMENTS**

43.     The Class Representatives also request Service Payments to each of them in the amount of $2,500, and $1,000 for each opt-in Plaintiff who participated in the mediation.  The Service Payments request was set out in the Notice and there were no objections made. See Exhibit B to the KCC Decl. annexed hereto as Exhibit 2.  The Service Payments requested are reasonable given the significant contributions these individuals made to advance the prosecution and resolution of the lawsuit.  The Class Representatives and those who assisted in the mediation each materially assisted Class Counsel by providing crucial information to allow Class Counsel to properly assess the claims and ultimate value of the claims.  The requested Service Payments are further justified because stepping forward to have one's name on a wage and hour complaint may invite a certain degree of scrutiny.

I declare under penalty of perjury under the laws of the United States that the foregoing is to the best of my knowledge true and correct.

Executed on this the 11th day of August, 2017, in Garden City, New York.

/s/ Sara Wyn Kane_____
Sara Wyn Kane
**VALLI KANE & VAGNINI LLP**
600 Old Country Road, Suite 519
Garden City, NY 11530
Telephone: (516) 203-7180